# EXHIBIT 1

### MASTER CLINICAL SERVICES AGREEMENT

THIS **MASTER CLINICAL SERVICES AGREEMENT** (the "Agreement") is made as of August 29, 2022 (the "Effective Date"), by and between Trial Runners, LLC, a North Dakota limited liability company with its principal place of business located at 116 W. Villard St., Dickinson, ND 58601 ("CRO"), and Aviceda Therapeutics, Inc. with its principal place of business located at One Broadway, 14th Floor, Cambridge, MA 02142 ("Sponsor").  CRO and Sponsor may be referred to herein individually as a "Party" and collectively as the "Parties."

### BACKGROUND

Sponsor wishes to retain CRO to perform clinical research services in connection with human clinical research programs conducted by Sponsor, which services will be as set forth in one or more Project Addenda (as defined below) to be attached to or referencing this Agreement.  CRO is in the business of providing clinical research services for the development of pharmaceutical products, and acts as a contract research organization to administer human clinical trials and perform data management and statistical services in connection with such trials; and is willing to provide such services to Sponsor in accordance with the terms and conditions of this Agreement and such Project Addendum.

**In consideration of the foregoing** and the mutual covenants and promises set forth herein, the Parties agree as follows:

1. **DEFINITIONS.**

    DEFINED TERMS SHALL HAVE THE MEANINGS BELOW AND AS DEFINED THROUGHOUT THE REMAINDER OF THIS AGREEMENT.

    1.1    "**Affiliates**" means (a) any person or entity controlled by, controlling, or under common control with a Party, and (b) with respect to CRO, those parties (excluding any Permitted Subcontractors) identified on the applicable Project Addendum, if any. For purposes of this Section, "control" (with corresponding meanings for the terms "controlled by" and "under common control with") shall mean:  (i) the ownership, directly or indirectly, by an entity of more than fifty percent (50%) of the voting securities, participating profit interest, or other ownership interests of the subject entity, or (ii) the possession, directly or indirectly, by an entity of the power to direct the management or polices of the subject entity, whether through the ownership of voting securities or by contract relating to voting rights or corporate governance; *provided*, *however*, that if local laws restrict foreign ownership, control will be established by direct or indirect ownership of the maximum ownership percentage that may, under such local law, be owned by foreign interests. Affiliates of CRO and Sponsor shall sometimes be referred to herein as "CRO Affiliates" and "Sponsor Affiliates," respectively.

    1.2    "**Amendment**" has the meaning set forth in Section 2.

    1.3    "**Applicable Laws**" means all supranational, federal, national, state, and local laws, rules, and regulations, including, without limitation, the regulations and guidelines of the Food, Drug, and Cosmetic Act (including 21 CFR Part 312, 50,

56, 54 and 11), as amended from time to time, and, as applicable, accepted standards of GCP that may be applicable to a Study or the Services.

**1.4** "**Budget**" has the meaning set forth in Section 6.

**1.5** "**C.F.R.**" means the United States Code of Federal Regulations or any successor body of regulations.

**1.6** "**Direct Expenses**" means the applicable fee for Services or price for each unit or group of units of work that comprise a Service to be performed under this Agreement, as applicable, as set forth in the applicable Project Addendum and Budget.

**1.7** "**GCP**" means current good clinical practice standards which have been adopted by the following, in each case to the extent applicable to the performance of Services: (i) the FDA; (ii) the European Medicines Agency or any European Member State agency; and (iii) the International Council for the Harmonisation of Technical Requirements for the Registration of Pharmaceuticals for Human Use (ICH) (including without limitation the (ICH Harmonised Tripartite Guideline For Good Clinical Practice E6(R1) Current Step 4 version dated 10 June 1996 (including the Post Step 4 corrections); each as may be supplemented or amended from time to time.

**1.8** "**FDA**" means the United States Food and Drug Administration or any successor agency thereto.

**1.9** "**ICF**" means the particular form, as approved by Sponsor and the applicable IRB and complying with the requirements of 21 C.F.R. Part 50, that the CRO and/or Investigator will use in the Study to obtain the informed consent of the subjects participating in the Study.

**1.10** "**Indirect Expense**" means the reasonable, direct (without mark-up), out-of-pocket, pass-through costs and expenses incurred by CRO or paid to third parties in connection with conducting a Study or the performance of the Services and which have been itemized in the Budget, including, without limitation, transportation, lodging, and meals for CRO employees, IRB fees, shipping, materials, supplies, and other third party costs such as payments to Sites and/or Investigators and laboratories; *provided*, *however*, that such Indirect Expenses shall not include any overhead or costs of general administration; *and provided further*, however, that to the extent the amount of any such costs and expenses exceed the amount set forth in the Budget for such costs and expenses, CRO must obtain Sponsor's prior written consent before such costs and expenses will become Indirect Expenses reimbursable pursuant to this Agreement. All Indirect Expenses shall be specifically identified in the Budget for the applicable Project Addendum.

**1.11** "**Investigator**" means a licensed physician who is a qualified clinical investigator and whom a Site has retained to conduct a particular Study.

1.12 "**IRB**" means, for a Study, the particular Institutional Review Board that complies with the requirements of 21 C.F.R. Part 56 and is responsible for the initial and continuing review and approval of the Study.

1.13 "**Permitted Subcontractor**" has the meaning set forth in Section 4.4.

1.14 "**Project Addendum**" means an individual project addendum executed between Sponsor and CRO for a given Study that: (i) expressly references this Agreement; (ii) is made with respect to such specific Study; (iii) is signed by both Parties; and (iv) specifies the parameters of and sets forth the details of the Services to be performed by CRO in conducting the Study and the Budget.

1.15 "**Protocol**" means the particular written protocol detailing the clinical testing procedures, conditions, and instructions for conducting a particular Study that is attached to or referenced in the applicable Project Addendum and incorporated by reference into such Project Addendum, as it may be amended pursuant to this Agreement.

1.16 "**SaaS Services**" are any Services which are software-as-a-service provided over the Internet.  SaaS Services include without limitation interactive voice and/or web response services and electronic data capture services.

1.17 "**Services**" means the particular tasks to be performed by CRO for a given Study pursuant to this Agreement, as more fully set forth herein and in the Project Addendum applicable to such Study.  The Services include the creation and provision of all Work Product.

1.18 "**Site**" means a particular entity retained by Sponsor that has access to clinical facilities suitable to perform a Study and at which facilities the applicable Investigator will perform such Study.

1.19 "**Specimens**" means any biological samples or specimens provided by or taken from any human subject in connection with their participation in a Study, including, without limitation, any tissue samples, blood samples, and tumor biopsies.  By-products and derivatives of any such samples, specimens, or biopsies shall also be considered Specimens.

1.20 "**Sponsor Confidential Information**" means:  (i) all scientific, technical and non-technical information relating to Sponsor's research, processes and methods, equipment, products, business practices, and/or Studies disclosed by or on behalf of Sponsor to CRO under this Agreement; (ii) all Work Product; and (iii) all Study Inventions, whether or not designated or confirmed as "confidential".  Sponsor Confidential Information may include, without limitation, commercial, medical, scientific, and technical information, data, plans and protocols relating to Sponsor, a Study Drug, any Study, or any information derived therefrom.  Sponsor Confidential Information may include any such third party information which Sponsor has received on a confidential basis.  Sponsor Confidential Information shall be the sole and exclusive property of Sponsor.

1.21 "**Study**" means a particular human clinical trial of a Study Drug conducted pursuant to the applicable Protocol, including any management and oversight thereof, with

respect to which Sponsor engages CRO to perform Services pursuant to this Agreement.

**1.22** "**Study Drug**" means, for a given Study, the therapeutic compound of Sponsor that is the subject of such Study, as described in the Protocol and Project Addendum applicable to such Study.

**1.23** "**Study Data**" means all data resulting from conducting a Study, including, without limitation, the data recorded on case report forms, laboratory work sheets, slides and reports, and all other data disclosed to CRO, generated by the Site(s), Investigator(s), CRO or other Study vendor(s) as a result of conducting the Study.

**1.24** "**Study Information**" means all materials, documents, data, and information disclosed to CRO by Sponsor, any Site, or any Investigator or generated, created, or learned by CRO as a result of performing a Study.

**1.25** "**Study Invention**" means any discovery, development, invention, technology, result, data, Specimen, material, information, concept, or idea, whether or not patentable, that Sponsor or CRO or their respective employees, agents, Permitted Subcontractors and/or contractors, either alone or jointly, makes, conceives, creates, develops, or reduces to practice as a result of (a) conducting a Study, (b) performing any obligations or activities assigned to such party or parties in connection with this Agreement or any Study, or (c) using the Study Drug or Sponsor Confidential Information, in each case together with all intellectual property rights relating thereto. "Study Inventions" may include, but is not limited to, processes, compositions, methods, software, tangible research products, formulas, techniques, patents, trade secrets, copyrights, and know-how, and any improvements related thereto.

**1.26** "**Work Product**" means all deliverables and work product, including without limitation, Study Data, Study Information, the project or trial master file from each Study, and all data, databases, records, reports, materials, compounds, samples, results, documents, templates, abstracts and summaries thereof, and prepared or commissioned works that are created or generated directly or indirectly as a result of performance of the Services, whether by CRO or its employees, agents, and/or Permitted Subcontractors, either alone or jointly.

## 2.   INDIVIDUAL PROJECT ADDENDA.

From time to time, Sponsor may request that CRO shall perform certain clinical research services relating to a specific clinical trial to be conducted by Sponsor.  With such request, Sponsor shall provide the details of the specific clinical services requested to be performed by CRO for such Study.  Promptly after such request, the Parties shall discuss the terms of a proposed Project Addendum that reflects such Services and the relevant details thereof.  If the Parties agree on the Project Addendum, it shall be executed by both Parties, and upon such execution such clinical study shall be a Study, and the CRO services covered by the Project Addendum shall be Services to be performed under this Agreement.  Each Project Addendum shall be agreed upon by the Parties on a Study-by-Study basis, and shall set forth with specificity the following, as applicable: (a) the Protocol for the particular Study, (b) the Budget and projected timeline for completion of the Services for such Study, (c) the Services to be performed by CRO related to the Study,

(d) the specific obligations relating to the Study that are being transferred to CRO by Sponsor as required by 21 C.F.R. § 312.52, which obligations shall be listed in the Form FDA-1571 submitted to the FDA regarding the Study Drug, (e) CRO's Direct Expenses and Indirect Expenses for such Services, and (f) the payment schedule for such Services. The Project Addendum for each Study will be sequentially numbered as a new "Project Addendum No. ____" to be attached hereto and the terms of this Agreement are incorporated therein.  Each Project Addendum may reference other exhibits or schedules, each of which shall be attached to or referenced by the Project Addendum and incorporated by reference therein.  Any changes or modifications to the Project Addendum (an "Amendment") shall be mutually agreed upon in a writing signed by authorized representatives of each Party, with each such signed Amendment to be attached hereto and incorporated herein. Each Amendment shall detail the modifications to the applicable Services, responsibilities, any change in regulatory obligations that have been transferred to CRO, changes to the Study Budget, payment schedule, Study timelines and/or other appropriate matters. The Parties agree to act in good faith to promptly agree on an Amendment that is mutually acceptable and promptly when considering an Amendment requested by the other Party. Any such Amendment shall apply only to the Study(s) pertaining to such Project Addendum and shall not act as an amendment to this Agreement as it relates to any prior or subsequent Project Addendum. There shall be no minimum or maximum limit to the number of Project Addenda that the Parties may incorporate under this Agreement.  In the event that the terms of a Project Addendum or any exhibits or schedules thereto conflict with the terms of this Agreement, the terms of this Agreement shall govern unless the Project Addendum specifically references this Agreement and indicates such specific terms of the Project Addendum shall govern with respect to such conflict.

**3.**     **SCOPE OF SERVICES.**

**Compliance with Project Addenda and Legal Requirements**.  CRO shall perform the Services set forth in each Project Addendum. CRO will perform, and warrants that it will perform, the Services to the best of its ability in a professional, workmanlike, and timely manner consistent with industry standards and, as a contract research organization, in accordance with 21 C.F.R. § 312.52, in no case less than, Good Industry Practice, and in strict accordance with Applicable Laws, the terms and conditions of this Agreement, the applicable Protocol, and any Project Addendum.  In the event that any Applicable Laws are changed, CRO shall comply with such new requirements. "Good Industry Practice" means in relation to any activity and under any circumstance, exercising the same skill, expertise and judgment and using facilities and resources of a similar or superior quality as would be expected from a person who is highly skilled and experienced in providing services in question, seeking in good faith to comply with his contractual obligations and seeking to avoid liability arising under any duty of care that might reasonably apply. In the event that compliance with new or modified Applicable Laws necessitates a change in a Project Addendum, CRO will promptly notify Sponsor and obtain Sponsor's consent to such change prior to implementation.  CRO shall take all reasonable steps to ensure that (i) its employees, agents, or any other persons or entities authorized to perform any of CRO's obligations under this Agreement or any Study are appropriately trained and qualified and have the appropriate skills and experience, and (ii) it and agents, or any other persons or entities authorized to perform any of CRO's obligations under this Agreement or any Study have appropriate facilities, resources and equipment necessary to conduct the Services, to perform the applicable obligations in accordance with the terms

of this Agreement.  CRO agrees to use commercially reasonable efforts to maintain the continuity of the assigned personnel designated to perform Services in the applicable Project Addendum. If Sponsor requests in writing the replacement of any CRO personnel due to reasonable concerns regarding such personnel's performance or conduct, CRO shall first make commercially reasonable efforts to correct the situation to the reasonable satisfaction of Sponsor, and in the alternative will promptly remove such personnel from the Services and assign an appropriately qualified and experienced replacement at no additional cost to Sponsor and without materially affecting the timing or performance of Services.  CRO agrees to carry out diligently all its obligations under this Agreement and all Project Addenda.

4.  **SPECIFIC CRO OBLIGATIONS.**

4.1  **Monitoring, IRB and Informed Consent**.  CRO shall process all personal data in accordance with this Agreement or as otherwise instructed by Sponsor or its Affiliates and in compliance with all Applicable Laws, including without limitation the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and any laws, regulations and guidelines related thereto and any other applicable data protection laws. CRO shall ensure that its Services are conducted in compliance with HIPAA and all other state and foreign laws respecting the privacy of personal data, regardless of whether such data is sensitive data. If applicable to the Study and the Services under the Project Addendum, CRO shall ensure that (i) all Sites secure approval of the Protocol, ICFs and advertisements for Study subject enrollment, if any, from appropriate IRB; (ii) no Protocol will be modified after approval by the IRB without written approval by Sponsor, and (iii) the Sites procure an ICF from each Study subject, as evidenced by a signed ICF, which shall include an authorization consenting to the use and disclosure of Study subject's personal health data. CRO shall notify Sponsor within one (1) business day of CRO becoming aware if IRB approval for a Study is lapsed, suspended or withdrawn, in whole or in part.

4.2  **MedDRA**.  In the event that CRO is requested to perform Services that require use of MedDRA (Medical Dictionary for Regulatory Activities), the details regarding MedDRA will be set forth in the applicable Project Addendum.

4.3  **Transfer of Obligations**.  Sponsor represents and certifies that it will not require CRO to perform any assignments or tasks in a manner that would violate Applicable Laws.  If Sponsor is transferring to CRO responsibility for any regulatory obligations under United States laws or regulations, CRO and Sponsor shall cooperate in the completion of a Transfer of Obligations Form in conjunction with this Agreement.  Any such regulatory responsibilities not specifically transferred in the Transfer of Obligations Form shall remain the regulatory responsibility of Sponsor.  The Transfer of Obligations Form will be filed with the United States Food and Drug Administration ("FDA") by Sponsor where appropriate, or as required by law or regulation.   On the effective date of termination of this Agreement or a Project Addendum, Sponsor immediately and automatically assumes (without the need for any further agreement/s) any and all legal and regulatory obligations of the applicable Study(ies) including all those previously transferred to and the responsibility of CRO.   CRO shall notify any and all

appropriate Investigators, institutional review boards, and regulatory authorities of such transfer.

**4.4**     **Services by Permitted Subcontractors and CRO Affiliates**.    CRO may subcontract certain of the Services to be performed by CRO under this Agreement and the applicable Project Addendum to third parties, with the prior written approval of Sponsor (each, a "Permitted Subcontractor).    Any Permitted Subcontractor that is identified along with the subcontracted Services in a signed Project Addendum shall be deemed consented to by Sponsor for such Project Addendum.    In the event that CRO subcontracts Services to a Permitted Subcontractor or CRO Affiliate to perform Services under this Agreement, CRO shall enter into an agreement with the Permitted Subcontractor or CRO Affiliate imposing obligations consistent with those which CRO assumes under this Agreement upon such Permitted Subcontractor or CRO Affiliate, including, at a minimum, provisions of ownership and allocation of intellectual property rights and for obligations of confidentiality and nondisclosure of information, record-keeping, access, and rights to data provisions. CRO shall remain liable for the performance of all CRO Permitted Subcontractors and CRO Affiliates and any breaches of any obligations under this Agreement by Permitted Subcontractors or CRO Affiliates. CRO shall not purport to enter into any agreement with any Permitted Subcontractor on behalf of Sponsor or otherwise to bind or obligate Sponsor to any Permitted Subcontractor.

**4.5**     **Investigators**.    Pursuant to a Project Addendum, Sponsor may delegate to CRO the responsibility for negotiation, executing and/or administering contracts with such Site parties which will govern their participation in the Study ("**Clinical Trial Agreements**").    Where CRO is negotiating Clinical Trial Agreements on behalf of Sponsor, CRO shall use a Clinical Trial Agreement template and fallback parameters approved by Sponsor.    If a Site requires a material change to any term of a Clinical Trial Agreement that is outside of the negotiation parameters for such Study, then CRO shall submit such proposed material change to Sponsor for approval; and Sponsor shall review, comment on and/or approve such proposed changes. Should any such contract negotiation with a Site result in a deadlock or remain for longer than expected, Sponsor and CRO shall discuss in good faith and Sponsor shall make a decision on whether or not negotiations should continue with or whether an alternative Site should be selected. CRO shall procure Sponsor's written consent prior to terminating negotiations with any potential Site. The Parties acknowledge and agree that such Sites and/or Investigators shall not be considered the employees, agents, or subcontractors of Sponsor or CRO.

**4.6**     **Reporting**.    CRO will perform all Services in close cooperation with Sponsor and will keep Sponsor and its personnel, as designated from time to time by Sponsor, continuously and reasonably informed of the progress of such Services.

**4.7**     **Clinical Supplies**.    To the extent any Project Addendum requires Sponsor to provide CRO with a quantity of Study Drug or other clinical supplies or materials ("**Materials**") to perform a Study, Sponsor shall make available to CRO all Materials, as appropriate for CRO to perform the Services for such Study, in accordance with the schedule set forth in the applicable Project Addendum.    CRO shall use the Materials solely for the purpose of conducting the Study, and for no other purpose.    CRO will provide Sponsor or its designee with reasonable written

DocuSign Envelope ID: 74981E7C-B64E-43B6-9F78-F66A1B438975

notice as to Investigator's needs for Materials as are agreed upon by CRO and Sponsor for the timely completion of each Study.  CRO will transport, store, handle, use and dispose of Materials in accordance with Sponsor's instructions, the Protocol, and Applicable Laws.  CRO shall not distribute any Materials to any third party other than its personnel or Sites or as specifically required in the applicable Project Addendum in order to perform the Services.  Upon the sooner to occur of (i) the completion, expiration or termination of the applicable Project Addendum and (ii) the request of Sponsor, CRO shall either destroy or return any unused Materials, as directed by Sponsor.  Sponsor retains all right, title and interest in and to the Materials.  Upon termination or completion of a Project Addendum, or upon removal of the Investigator, Sponsor, in its sole discretion, may require CRO to either recover or destroy (at Sponsor's cost), all remaining quantities of the Materials from the applicable Sites and Investigator, as set forth in the applicable Project Addendum.

**4.8**    **Adverse Events**. CRO shall promptly notify Sponsor in writing of any serious and/or unexpected adverse drug reaction or injury affecting any Study subject as a result of participation in a Study (the "**Adverse Event**").  All such Adverse Event notifications shall be made within one business day of CRO becoming aware of the Adverse Event unless otherwise agreed between the Parties in an agreed safety plan and CRO shall provide Sponsor with all documentation and data in the possession of CRO or its Permitted Subcontractors concerning Adverse Events, as may be required for Sponsor's evaluation.

**4.9**    **<u>Study Oversight</u>**.  CRO will designate a Project lead ("**<u>CRO Project Leader</u>**") who shall be identified in such Project Addendum and will be available for frequent communications with Sponsor regarding Services provided under that Project Addendum.  CRO shall promptly terminate the assignment of any CRO Project Leader to any particular Project Addendum for reasonable cause identified by Sponsor.  CRO shall not replace or remove the CRO Project Leader without Sponsor's written consent, except in the event of voluntary resignation, promotion, termination for cause, disability or medical leave.  In such event, CRO shall, subject to the approval of Sponsor, replace the affected employee with an individual who possesses similar skills, experience and authority.  Sponsor will designate a representative who will be the point of contact ("**<u>Sponsor Representative</u>**").  Further, CRO shall advise and update Sponsor on a regular basis, and as needed, to keep Sponsor current on significant progress, decisions and issues that arise with respect to the Services, but in no event less frequently than providing Sponsor a written report one time per month (or as otherwise required by a Project Addendum) and meeting telephonically or in person, at the expense of Sponsor, at the request of Sponsor.  Reports shall be in sufficient detail to keep Sponsor current on the status of the Services and any significant events or matters affecting any Services hereunder, to clearly apprise Sponsor of any need to make decisions, and to provide guidance to CRO as may be useful or necessary.

**4.10**    **IRS and Other SaaS Services**. Sponsor agrees Permitted Subcontractors may include cloud service providers with whom CRO may disclose Sponsor Confidential Information. Where the Services under a given Project Addendum include SaaS Services, this Section 4.10 shall apply.

(b)    The SaaS Services shall utilize industry standard security measures to protect Sponsor's account, passwords and files, and all SaaS Data (as defined below).  The SaaS Services shall include, for Sponsor and Users (as defined below), commercially appropriate 24x7x365 technical support for the SaaS Services, by e-mail and telephone.  If an error materially impacts use of the SaaS Services, continuous and diligent efforts shall be used to resolve the error as soon as possible.

(c)    For each SaaS Service, appropriate in-person, phone, and/or web-based training and training materials will be provided for Users to administer and use the SaaS Service, set permissions, and make configuration changes to the extent reasonably necessary for such User's use of the SaaS Service.  This shall include training and training materials in English and such other languages as reasonably requested by Sponsor. "Users" include Sites, Study subjects and employees, consultants, contractors, agents, and designees of Sponsor.

(d)    Sponsor shall have the right during the term of each Project Addendum under which SaaS Services are provided, and for sixty (60) days thereafter, to access and use, and to permit Sponsor's Users to access and use, the SaaS Services provided under that Project Addendum (solely for purposes related to the applicable Study).

(e)    "SaaS Data" means all data and information input into the SaaS Service provided under a given Project Addendum, whether input by Sponsor or a Study subject or other User, and all reports, data and information output, resulting, or accessible from the SaaS Service.  SaaS Data shall be backed up at least on a daily basis.  In no event shall Sponsor be preclude from retrieving the SaaS Data.

(f)    CRO warrants (i) that the SaaS Services will perform substantially in accordance with specifications and requirements under the applicable Project Addendum and this Agreement and in accordance with their descriptions, training materials, and user documentation, (ii) the functionality, capabilities, performance, and quality of the SaaS Services will not be materially decreased during the term of this Agreement, (iii) the SaaS Services will be available for use 24x7x365 worldwide, excluding any periods of time during which the Services are not available for use due to regularly scheduled maintenance or force majeure event (CRO will give Sponsor at least three business days' prior notice of any regularly scheduled maintenance), (v) the SaaS Data input to the SaaS Services shall be accurately processed and available substantially in real time, and (vi) downloads from the SaaS Services will be screened (just prior to download by User) by commercially available virus detection software to help assure they contain no viruses.

5.    **CONFIDENTIALITY.**

5.1    **Non-Disclosure and Non-Use of Confidential Information**.  CRO will hold in confidence and not disclose to third parties, without the prior written consent of Sponsor, any Sponsor Confidential Information; *provided*,

DocuSign Envelope ID: 74981E7C-B64E-43B6-9578-F56A1B138975

*however*, that CRO may disclose specific Sponsor Confidential Information to its employees and Permitted Subcontractors or permitted agents (collectively, "**Representatives**") who need to know such Sponsor Confidential Information for purposes of performance of the Services under the applicable Project Addendum, but only if such Representatives are subject to binding confidentiality and non-use obligations with respect to the Sponsor Confidential Information and Sponsor's ownership of the Study Inventions at least as protective as those found in this Agreement. CRO shall be responsible to Sponsor for any act or omission by its Representatives which would constitute a breach under this Agreement (including Project Addenda). CRO will protect the confidentiality of Sponsor Confidential Information using at least the same level of effort as it uses to protect its own confidential or proprietary information, but in no event will CRO use less than commercially reasonable efforts. CRO may use such Sponsor Confidential Information only to the extent required to perform Services under the applicable Project Addendum, and shall not use any Sponsor Confidential Information for any other purpose.  In particular, CRO shall not file any patent application containing any claim the subject matter of which is derived from Sponsor Confidential Information.  CRO shall not use Sponsor Confidential Information for any purpose or in any manner that would constitute a violation of any Applicable Laws.  Upon the expiration or earlier termination of this Agreement, and/or upon the request of Sponsor, subject to Section 9.4 (a) CRO will promptly return to Sponsor any or all Sponsor Confidential Information in CRO's possession or control in documentary or other tangible form, including all copies, derivatives, extracts, other tangible embodiments or summaries thereof made by CRO or its representatives, and (b) destroy any or all Sponsor Confidential Information in CRO's possession or control and stored in then-accessible electronic or other media; provided that CRO may separately retain one secure archival copy as a record of its obligations under this Section 5 and for regulatory or insurance purposes; provided, further that there shall be no obligation to delete or destroy any electronic back-ups that have been created solely by the automatic or routine archiving and back-up procedures of CRO to the extent created and retained in a manner consistent with its standard archiving and back-up procedures. The return and/or destruction of such Sponsor Confidential Information as provided above shall not relieve CRO of its other obligations under this Agreement with respect to such Sponsor Confidential Information.

5.2     **Exceptions to Confidential Information**.  "Confidential Information" shall not apply to the limited portion of information that CRO can demonstrate, as evidenced by contemporaneous written records in CRO's possession: (a) is or becomes generally known or publicly available through no fault of, or breach of this Section 5 by, CRO or its Representatives; (b) is already known by CRO at the time of receiving such information, without obligation of confidentiality, as evidenced by CRO's prior written records, except from prior disclosure by Sponsor; or (c) is furnished to CRO, without restriction on disclosure, by a third party who has the lawful right to disclose such information.  Any combination of features or disclosures shall not be deemed to fall within the foregoing exclusions merely because

DocuSign Envelope ID: 74981E7C-B64E-43B6-9578-E56A1B138975

certain individual features are published or available to the general public or in the rightful possession of CRO unless the combination as a whole falls within any of the above exceptions.

5.3     **Compelled Disclosure**.  CRO may disclose specific Sponsor Confidential Information solely to the extent that such disclosure is required by Applicable Law or court order; *provided*, *however*, that CRO both (i) gives prompt prior written notice to Sponsor of the disclosure requirement in order to allow Sponsor to obtain any available limitation on, confidential treatment of, or exemptions from such disclosure requirement, and (ii) reasonably cooperates in such efforts by Sponsor, at Sponsor's expense, to take all legally available steps to protect, prevent and/or narrow such disclosure, including, without limitation, by seeking a protective order or confidential treatment.  CRO will restrict any required disclosure to only that portion of Sponsor's Confidential Information which it is advised by legal counsel is legally required to be disclosed. Such information shall remain subject to the provisions of this Section 5.

5.4     **Third Party Confidential Information**.  Neither Party shall disclose to the other any confidential or proprietary information that belongs to any third party during its performance under this Agreement, except that which a Party has rights to disclose.

5.5     **Publication**.  CRO shall not publish any articles or make any presentation relating to the Services or referring to Study Information, Study Data, Study Inventions, Sponsor Materials or Sponsor Confidential Information without the specific, express, prior written consent of Sponsor.

5.6     **Remedies**.

(a)     In the event of any actual or threatened breach of this Agreement by CRO relating to Sponsor Confidential Information and/or Study Inventions, including, without limitation, the actual or threatened unauthorized use or disclosure of Sponsor Confidential Information without Sponsor's prior express written consent, Sponsor will suffer an irreparable and continuing injury, such that no remedy at law will afford it adequate protection against, or appropriate compensation for, such injury.  Accordingly, CRO hereby agrees that, in such event, and in addition to any other remedies that may be available at law, in equity or otherwise, Sponsor shall be entitled to obtain equitable relief against such breach or threatened breach of this Agreement without the necessity of proving actual damages or posting a bond or other security.

(b)     CRO recognizes that the performance of the obligations under this Section is special, unique and extraordinary in character.

5.7    **Data Privacy**.   Notwithstanding anything herein to the contrary, the Parties will, to the extent applicable, comply with all applicable statutes and regulations relating to the use, dissemination and disclosure of individually identifiable patient information, including without limitation Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations promulgated thereunder from time to time ("HIPAA"), with respect to personal health information as defined under HIPAA.  The Parties hereto, even if not each a covered entity under HIPAA, recognize that pursuant to this Agreement, they have the responsibility to protect all individually identifiable patient information consistent with the protections afforded to Sponsor Confidential Information under the terms of this Agreement; and only to use or disclose such information as permitted by the authorization of Study subjects, as necessary to discuss and analyze the results of the Study, to ensure research integrity, to communicate with regulatory authorities, and as otherwise permitted by Applicable Law.

6.    **COMPENSATION.**

6.1    **Budget**.   Each Project Addendum will contain a budget, which shall include, as appropriate for the applicable Study, a list of CRO's Direct Expenses and Indirect Expenses, and any other pricing terms mutually agreed upon by the Parties and set forth therein (the "Budget").  Sponsor will pay CRO for all Services performed by CRO in compliance with this Agreement in accordance with the Budget.  The Budget may not be modified except by a formal written amendment, signed by both Parties, to the Individual Project Addendum that includes the applicable Budget.

6.2    **Invoices and Payment**.  CRO will invoice Sponsor for Services performed by CRO in accordance with the Budget on a monthly basis unless the Services shall be paid on a milestone basis per the applicable Project Addendum.  Payment for Direct Expenses and Indirect Expenses will be made according to the Budget.   CRO will provide reasonably detailed invoices regarding Services for which Direct Expenses are being invoiced, together with accompanying documentation regarding any Indirect Expenses incurred by CRO in the prior month for which reimbursement is sought, by the 5th day of each month.   Sponsor shall pay undisputed invoices within thirty (30) days of receipt of an invoice.  If any portion of the invoice is disputed, Sponsor shall pay the undisputed amounts in accordance with this Section 6 and the Parties shall use good faith efforts to reconcile the disputed amount as soon as practicable. Sponsor agrees to pay the disputed amounts promptly upon dispute resolution. All Indirect Expenses shall be (1) invoiced by CRO in the currency used by CRO to pay such costs and expenses, and (2) reimbursed by Sponsor in United States Dollars using the spot rate for the day such cost or expense is incurred, as listed in OANDA.com or any other publication mutually agreed

upon by the Parties, in each case, as specified in the applicable Project Addendum. The Direct Expenses included in the Budget shall be in United States Dollars. CRO will retain records of all expenses, including receipts, and will make such records available to Sponsor upon request. Taxes, including, but not limited to, sales, service, and any penalties thereon imposed on any payment made by Sponsor to CRO shall be solely CRO's responsibility. Any Value Added Taxes (VAT) will be handled as a pass thru cost to the Sponsor and included as a line item expense, along with supporting documentation with each applicable invoice from the CRO. Sponsor and CRO will review the Budget on a quarterly basis to reconcile all work completed by CRO and all work remaining to be completed by CRO under the applicable Project Addendum against the amounts invoiced by CRO and the remaining Budget amounts.

CRO shall remit all invoices to:

> Aviceda Therapeutics, Inc.
> One Broadway, 14th Floor
> Cambridge, MA 02142
> Attention: Accounts Payable
> Email: accounting@avicedarx.com; mgenead@avicedarx.com

Payments to CRO shall be made to:

> Trial Runners, LLC,
> 116 W. Villard
> Dickinson, ND 58601
> Tax ID#: 22-3935703

**6.3    Site Payments**. Pursuant to an Project Addendum, the Parties may agree that payments to Sites be administered on Sponsor's behalf by CRO, acting solely as payment agent. CRO shall distribute all payments to Sites according to the provisions of the Site's respective Clinical Trial Agreement and the applicable Project Addendum ("**Grant Payments**"). When Sponsor must publicly report to certain government or regulatory authorities information regarding payments or transfers of value to certain healthcare professionals by or on behalf of Sponsor to comply with applicable law, CRO will prepare and submit financial reports to Sponsor on a mutually agreeable periodic frequency and format. In order to provide for timely payments to Sites, the Parties may agree to an advance payment made by Sponsor to CRO of such amount as are delineated in the Project Addendum for such purpose ("**Grant Advance Payment**"). All future amounts invoiced to Sponsor based on payment obligations to Sites will be based upon CRO's estimate of projected costs owed to Sites, with the Grant Advance Payment serving to provide available funds for CRO to make payments to Sites, while said invoices are processed by Sponsor. At regular intervals, but not less frequent than every three (3) months, the Parties shall review the balance of grant funds to ensure that it is neither insufficient nor excessive; and if needed adjust accordingly. At the completion or earlier termination of the Study, a reconciliation of grant

funds will be performed and documented by CRO and provided to Sponsor in order to ensure that Sponsor pays for only those grants actually incurred.  Any remaining balance of the Grant Advance Payment, if any, will then be applied to the final invoice, if unpaid, and any remaining Grant Advance Payment will be refunded to Sponsor within thirty (30) days from the date of the final Grant Payment reconciliation.  Sponsor agrees that CRO will not make Grant Payments to Sites without sufficient funds available.

6.4    **Election of Remedies**.  If CRO does not perform a part of a Project Addendum, Study, or Service as required under this Agreement and relevant Project Addendum, or if CRO's performance of such part does not comply with its obligations under this Agreement, including incomplete Services or Services containing a material error(s), then, without limiting Sponsor's other remedies under this Agreement, CRO shall (at Sponsor's election) either (i) return the consideration (including Direct Expenses) paid for that portion of the Study or Services that is not in compliance with CRO's obligations under this Agreement, or (ii) perform or re-perform, at CRO's expense if the applicable Direct Expenses for such Service have already been paid by Sponsor, within thirty (30) days of receipt of notice of the noncompliance, the Study or Services to the extent of the noncompliance.

6.5    **AMENDMENTS**.  The Parties may not amend or modify this Agreement or any Project Addendum except by a writing signed by an authorized representative of each Party.

7.    **TERM; EARLY TERMINATION.**

7.1    **Term**.  This Agreement shall become effective on the Effective Date and shall continue in full force and effect for a period of the longer of (i) three (3) years or (ii) completion or termination of the last Project Addendum executed prior to the third anniversary of this Agreement, unless terminated early in accordance with this Section 7 ("Term").  Project Addendums shall commence upon the effective date listed therein and shall terminate on its termination date or upon the completion of Services and delivery of all Work Product, whichever is specified thereunder, unless earlier terminated in accordance with this Agreement.

7.2    **Termination by Sponsor**.  Sponsor may terminate this Agreement or any specific Project Addendum at any time and for any reason in whole or in part upon thirty (30) days' written notice to CRO.  CRO may terminate this Agreement at any time and for any reason in whole or in part upon ninety (90) days' written notice to Sponsor, provided that, unless Sponsor provides otherwise, CRO shall complete all Project Addenda outstanding at the time of such notice and this Agreement shall continue in effect until all such Project Addenda are completed or terminated.  Termination of this Agreement by either Party shall automatically terminate any and all underlying Project Addenda, except as otherwise provided in the prior sentence.

7.3 **Termination of a Project Addendum for Good Cause**. Sponsor may terminate a Project Addendum related to a Study for good cause immediately upon written notice to CRO. The term "good cause" shall include, without limitation, identification of any medical risk to Study participants, a showing that the Study Drug tested in the applicable Study is not effective, or receipt of notice of regulatory action by the FDA (or any equivalent oversight body in a country other than the United States) terminating or suspending a Study.

7.4 **Termination for Material Breach**. Either Party may terminate this Agreement and/or any Project Addendum if the other Party materially breaches this Agreement or any Project Addendum and such breaching Party fails to cure the breach within thirty (30) days after receipt of written notice from the non-breaching Party, such notice specifying in detail the nature of the breach.

7.5 **Consequences of Termination**. Upon termination of this Agreement or any Project Addendum, CRO and Sponsor mutually agree (i) to cooperate to provide for an orderly wind-down of the Services provided by CRO hereunder, (ii) that CRO shall not undertake further work, shall use its best efforts to avoid incurring any additional costs, to mitigate all costs, damages, penalties, and expenses or shall not enter into further commitments with regard to any Services, except as mutually agreed upon in writing by the Parties, (iii) that CRO shall use all reasonable efforts to conclude or transfer any uncompleted Services, as directed by Sponsor, as expeditiously as possible and in accordance with all Applicable Laws, and (iv) that CRO shall deliver to Sponsor all Work Product developed as of the date of such termination and expiration, and all formats available, including electronic format and computer files and programs, that are the property of Sponsor as defined in this Agreement and such Project Addendum. In the event CRO is providing SaaS Services or is responsible for managing any SaaS Services vendor(s), CRO shall ensure all Study Data, Study Information and SaaS Service records maintained by CRO and/or such vendor(s) are transferred to Sponsor promptly following completion or termination of a Project Addendum. Unless otherwise specified in such Project Addendum, all such Study Data, Study Information and records that are transferred shall be in the format specified in such Project Addendum or, if not specified, in any format reasonably requested by Sponsor (including without limitation a platform agnostic format). In the event this Agreement or any Project Addendum is terminated pursuant to this Agreement, CRO shall be compensated for (A) all Direct Expenses earned and Indirect Expenses incurred pursuant to the applicable Project Addendum as of the date of termination as set forth in the Study Budget and payment schedule of the applicable Project Addendum, and (B) unless the Agreement or applicable Project Addendum is terminated by Sponsor pursuant to Section 7.4, those fees for Services and reasonable expenses agreed upon by the Parties in writing upon termination which are reasonably necessary to conduct an orderly wind-down, close out, or transfer of the Study in accordance with this Section 7.5. Any funds held by CRO which are unearned at the date of termination shall be returned to Sponsor within

thirty (30) days after the termination date. At Sponsor's written request, CRO shall require the applicable Sites and Investigators of a terminated Study to cease enrolling additional subjects in such Study. CRO and Sponsor will cooperate with each other regarding the termination of a Study to safeguard subject safety, continuity of subject treatment, and to comply with Applicable Laws.

7.6 **Survival of Obligations**. Sections 1, 4.3, 4.4, 4.7, 4.10(d), 5, 6.3, 6.4, 7.5, 7.6, 10, 11, 12 and 13 shall survive the termination of this Agreement.

## 8. REPRESENTATIONS AND WARRANTIES.

8.1 **No Inconsistent Obligations or Constraints Upon The Parties**. Each Party represents and warrants that it is qualified and permitted and has full authority to enter into and perform this Agreement and all Project Addendums and that the terms of this Agreement and all Project Addendums are not inconsistent with its other contractual arrangements. Each Party further represents and warrants that it is not constrained by any existing agreement in providing complete disclosures to the other Party concerning obligations to be performed under this Agreement and all Project Addendums.

8.2 **Due Authorization**. Each Party represents and warrants that (a) it has full power and authority to enter into this Agreement, (b) this Agreement has been duly authorized, and (c) this Agreement is binding upon it.

8.3 **No Pending Litigation**. Each Party represents and warrants that: (a) it is not currently involved in any litigation, and is unaware of any pending litigation proceedings, relating to CRO's role in the conduct of a clinical trial for any third party; and (b) it has not received any warnings from the FDA (or any equivalent oversight body in a country other than the United States) relating to the Services.

8.4 **No Debarred Person**. CRO warrants and represents that it is not, and it has not, and shall not knowingly employ, contract with or retain any individual, corporation, partnership or association, including its personnel, directly or indirectly to perform Services under this Agreement that has been, debarred by the FDA under 21 U.S.C. 335a (Section 306, Federal Food, Drug and Cosmetic Act) or is under investigation by the FDA for debarment. In addition, CRO represents and warrants that it has not engaged in any conduct or activity which could lead to debarment actions. In the event that CRO becomes aware of or receives notice that it or any individual, corporation, partnership or association employed or retained directly by CRO to perform the Services (i) comes under investigation by the FDA for a debarment action or (ii) is debarred, CRO shall immediately notify Sponsor and address the issue as directed by Sponsor. Upon the receipt of such notice by Sponsor or if Sponsor otherwise becomes aware of such debarment or threatened debarment, Sponsor shall have the right to terminate this Agreement immediately upon written notice to CRO or to request that CRO promptly remove and replace any such debarred individual, corporation, partnership or association with a substitute having

the necessary skills and training to perform Services under this Agreement.

## 9.    REGULATORY

**9.1    Regulatory Inspections**.  If any governmental regulatory authority of appropriate jurisdiction conducts, or gives notice of intent to conduct, an inspection at CRO's facility or any Site relating to a Study or takes any other regulatory action with respect to Services provided by CRO pursuant to this Agreement, CRO will promptly give Sponsor notice thereof, supply to Sponsor all information pertinent thereto, and cooperate fully with such inspection.  Sponsor or its representatives shall have the right, but not the obligation, to be present at any such inspection or regulatory action.  If Sponsor receives notice of any such inspection to be conducted at a CRO facility or any Site, Sponsor will inform CRO of such inspection and reasonably cooperate with CRO by providing any information requested of Sponsor by the inspecting authority.  CRO will notify Sponsor of any significant inspection findings within thirty (30) days of receipt of inspection findings, including the issuance of a FDA Form 483 or warning letters or other similar letters with respect to any Study-related activity and CRO's response or corrective actions to such findings.  CRO agrees to promptly take any steps requested by any inspecting authority to cure any deficiencies which are discovered as a result of any audit or inspection of CRO's or, as applicable, its Affiliates' or Permitted Subcontractors' facilities.

**9.2    Site Visits by Sponsor**.  Sponsor or Sponsor's representatives may visit and/or meet with CRO, its employees, or its Permitted Subcontractors at reasonable times and with reasonable frequency during normal business hours to observe the progress of the Services and review Study Information.  CRO shall assist Sponsor with scheduling such visits and such visits shall be at Sponsor's expense.

**9.3    Review by Sponsor**.  Sponsor or Sponsor's representatives shall, upon reasonable notice to CRO, have access to and be permitted to inspect all CRO's and its Affiliates' or Permitted Subcontractors' facilities, records relating to the Services and Study Information in the possession or control of CRO or its Affiliates or Permitted Subcontractors relating to the Services performed under any Project Addendum.  Upon receipt of notice of any findings made by Sponsor in connection with any inspection or audit, CRO shall respond in writing to Sponsor within thirty (30) days of receiving such notice.  CRO agrees to promptly take any steps reasonably requested by Sponsor to cure any deficiencies which are discovered as a result of any audit or inspection of CRO, including if the CRO fails to follow Applicable Laws.

**9.4    Maintenance of Records**.  Subject to CRO's obligations of non-use and non-disclosure with regard to Sponsor Confidential Information, CRO may retain in its possession a copy of Sponsor Confidential Information that consists of any and all Study Information, Study Data, documents or other information related to the performance of this Agreement solely as

required for regulatory, legal, or insurance purposes. CRO shall maintain its records in a professional manner so as to permit Sponsor to review the Study Information, Study Data and other records, documents, information, and Materials related to the Study in full without disclosing to Sponsor any third party confidential or proprietary information. Unless otherwise required by Applicable Law, the terms of this Agreement, or any applicable Project Addendum, CRO shall maintain all such records for each Study, until the later of: (a) two (2) years following the date a New Drug Application or Biologics License Application is approved for the Study Drug that is the subject of the Study; or (b) two (2) years after the Investigational New Drug Application for such Study Drug is terminated or withdrawn. After this time period, CRO shall, at Sponsor's request and option, return Sponsor Confidential Information or dispose of Sponsor Confidential Information; *provided*, that, CRO shall not destroy any such records until it has obtained Sponsor's express, prior written permission to do so. CRO may use such retained Sponsor Confidential Information solely to the extent required for regulatory, legal, or insurance purposes, and for no other purpose. CRO is not responsible for the compliance or non-compliance of applications or systems used by third parties (including, but not limited to, investigative sites or third party laboratories), or any Part 11 audits or assessments thereof, unless such applications or systems are owned or provided by CRO.

## 10. WORK PRODUCT; STUDY INVENTIONS AND INTELLECTUAL PROPERTY.

10.1 **Disclosure of Study Inventions**. CRO shall promptly disclose in writing to Sponsor (or any person designated by Sponsor in writing) a full written description of any and all Study Inventions. All Study Inventions and any information with respect thereto shall be deemed Sponsor Confidential Information.

10.2 **Ownership of Intellectual Property Rights**. All right, title, and interest in and to any Study Inventions shall belong solely to Sponsor, regardless of the party that makes, discovers, creates, or invents such Study Invention. CRO understands and agrees that CRO has no right to use the Study Inventions or any Sponsor Confidential Information, except as expressly permitted by this Agreement. Notwithstanding the foregoing, all original patient records are the sole and exclusive property of the respective subjects, to be retained in accordance with Applicable Law. Sponsor shall have the sole and exclusive right to obtain, at its option and expense, patent protections in the United States and foreign countries on any such Study Inventions.

10.3 **Further Assurances**. CRO and its Representatives shall, upon Sponsor's request and at Sponsor's expense (the "Further Assurances"), (i) cooperate with and assist Sponsor, both during and after the Term of this Agreement, in perfecting, protecting, enforcing, and maintaining Sponsor's rights in any Study Inventions, including United States and foreign counterpart patent applications and patents, (ii) provide access to records and notebooks related to the Services, and (iii) execute and

deliver to Sponsor any documents and take such other actions deemed necessary or appropriate by Sponsor, in its sole discretion, to perfect, protect, enforce, and maintain Sponsor's rights in the Study Inventions, including United States and foreign counterpart patent applications and patents, to confirm the assignments hereunder and to otherwise carry out the purpose of this Agreement. Sponsor will reimburse CRO for any reasonable out-of-pocket expenses actually incurred by CRO in fulfilling its obligations with respect to Further Assurances.

10.4 **Assignment Obligations**. CRO shall ensure that each of its Representatives performing any part of the Services or any Study has a contractual obligation to assign all Study Inventions and intellectual property rights therein conceived, created, developed, or reduced to practice by such Representatives as a result of performing the Services during the Term of this Agreement to CRO so that it can comply with its obligations under this Agreement with respect to Study Inventions and otherwise effectuate the terms of this Section, and CRO shall promptly obtain such assignments and enforce such agreements to provide Sponsor with the benefits of this Section.

10.5 **Work Product**. Sponsor shall own all right, title, and interest in and to all Work Product, which shall be the sole and exclusive property of Sponsor. CRO understands and agrees that CRO has no right to use Work Product, except as expressly permitted by this Agreement. CRO shall transfer and assign all rights to all Work Product to Sponsor in accordance with this Section.

10.6 **Specimens**. Sponsor shall exclusively and solely own all Specimens. CRO shall not use Specimens for any purpose other than those explicitly set forth in the applicable Protocol. CRO shall ensure that all Specimens are collected, stored and transported in accordance with the applicable Protocols and all Applicable Laws. CRO shall obtain all required Specimens and deliver such Specimens to Sponsor as required by the applicable Project Addendum.

10.7 **Permitted Subcontractors and CRO Affiliates**. In the event that CRO uses Permitted Subcontractors or CRO Affiliates in performing CRO's obligations under this Agreement or any Project Addendum, then CRO shall ensure that each Permitted Subcontractor and/or CRO Affiliate, as applicable, and their respective employees, and agents shall be bound by provisions of this Section to the same extent as is CRO, except as may otherwise be approved in writing by Sponsor, and CRO shall be responsible for any violation by such Permitted Subcontractors and/or CRO Affiliates of the obligations in this Section.

10.8 **CRO Intellectual Property**. Sponsor agrees that as of the Effective Date, CRO possesses or may in the future possess, methods, technical expertise, software, and other proprietary information and technologies that have been developed by CRO independent of the Services ("CRO IP") and which will remain the sole and exclusive property of CRO, except to the extent that improvements or modifications include, incorporate or

are based upon Sponsor Confidential Information. Improvements or enhancements made to CRO's processes or methods which are independently developed incidental to the provision of Services hereunder will remain the sole property of CRO. CRO hereby grants Sponsor a non-exclusive, world-wide, perpetual non-transferable, royalty-free, license in CRO IP to the extent incorporated in any Work Product and/or Study Inventions to enable Sponsor to use and exploit such Work Product and/or Study Inventions. Such license shall be sublicensable by Sponsor to its Affiliates, licensees, collaboration partners, contractors or other parties who receive a license(s) or sublicense(s) to any Work Product and/or Study Inventions from Sponsor.

10.9 **Third Party Materials**. To the extent that Work Product contain any Third Party Materials (as defined below), CRO shall secure for Sponsor a fully paid up, royalty-free, non-exclusive, non-transferable, world-wide, perpetual license in such Third Party Materials solely to the extent necessary or useful to allow Sponsor to use and exploit the Work Product. Such license shall be sublicensable by Sponsor to its Affiliates, licensees, collaboration partners, contractors or other parties who receive a license(s) or sublicense(s) to any Work Product from Sponsor. "Third Party Materials" means any data or other materials obtained by CRO or its Affiliates from third parties or proprietary databases maintained by third parties, scales, or copies of published articles.

10.10 **Statistical Programming**. CRO's statistical programming (e.g., SAS programs) developed or provided in connection with a Project Addendum will be provided to Sponsor to (i) enable internal validation, and (ii) support Sponsor's or its sublicensee's submissions to the FDA or other regulatory agencies for the Study Drug for which such statistical programming was applied; provided, that Sponsor and/or its sublicensee shall take all reasonable efforts to protect the confidentiality of such statistical programming with the FDA or other regulatory agency. Sponsor agrees that the statistical programming will be used only in connection with the Study for which it was written and will not be used for any other purpose.

11. **INDEMNIFICATION.**

11.1 **By Sponsor**. Sponsor agrees to indemnify, defend, and hold harmless CRO and its directors, officers, employees, and agents (each, a "CRO Indemnitee") from and against any third-party claim, action or suit ("Third-Party Claim"), and any and all losses, settlements, damages, judgments, expenses and costs (including reasonable attorneys' fees and court costs) resulting from such Third-Party Claim ("Losses"), to the extent arising out of or resulting from (A) the use or administration of a Study Drug or Protocol-required procedure in accordance with the applicable Protocol to which the Study subjects would not have been exposed but for their participation in such Study, (B) any Sponsor Indemnitee's negligence, recklessness, or willful misconduct; (C) any Sponsor Indemnitee's failure to comply with (i) the terms of this Agreement, the applicable Protocol or the applicable Project Addendum or (ii) any and all Applicable Laws; and

(D) any Sponsor Indemnitee's breach of any of its representations, warranties, or covenants set forth under this Agreement; except to the extent that any such Third-Party Claims arise from or are due to: (a) any CRO Indemnitee's negligence, recklessness, or willful misconduct; (b) any CRO Indemnitee's failure to comply with (i) the terms of this Agreement, the applicable Protocol, the applicable Project Addendum, and/or Sponsor's written instructions or (ii) any and all Applicable Laws; or (c) any CRO Indemnitee's breach of any of its representations, warranties, or covenants set forth under this Agreement.

11.2    **By CRO**. CRO agrees to indemnify, defend, and hold harmless Sponsor, its Affiliates and their respective directors, officers, agents, consultants and employees (each, a "Sponsor Indemnitee") from and against any and all Third-Party Claims and Losses to the extent arising out of or resulting from: (a) any CRO Indemnitee's negligence, recklessness, or willful misconduct; (b) any CRO Indemnitee's failure to comply with (i) the terms of this Agreement, the applicable Protocol, the applicable Project Addendum and/or Sponsor's instructions or (ii) any and all Applicable Laws; and (c) any CRO Indemnitee's breach of any of its representations, warranties, or covenants set forth under this Agreement.

11.3    **Procedure**. A party seeking indemnification ("Indemnified Party") from a Party (the "Indemnifying Party") will promptly notify the Indemnifying Party in writing of any Third-Party Claim giving rise to indemnification hereunder and shall tender defense thereof to the Indemnifying Party, which shall have sole control of the settlement or disposition thereof, including, without limitation, the selection of defense counsel. The Indemnified Party will fully cooperate with the Indemnifying Party in the defense and settlement of all such Third-Party Claims at the Indemnifying Party's request and expense. The failure to promptly deliver notice to the Indemnifying Party shall relieve the Indemnifying Party of any liability to the Indemnified Party under this Agreement only to the extent prejudicial to the Indemnifying Party's ability to defend such Third-Party Claim. The Indemnifying Party will keep the Indemnified Party advised concerning the relevant Third-Party Claim(s) for which indemnification is sought, and the Indemnifying Party shall not enter into any settlement or document that admits wrongdoing or liability with respect thereto or imposes upon the Indemnified Party any monetary or other liability or obligation which cannot and/or will not be fully assumed and performed by the Indemnifying Party, without the express prior written consent of the Indemnified Party, such consent not to be unreasonably withheld or delayed.

## 12.    INSURANCE.

12.1    **Coverage**. During the Term of this Agreement and for a period of at least five (5) years thereafter, CRO shall secure and maintain in full force and effect throughout the performance of the Services under this Agreement, insurance coverage for: (a) professional liability insurance with policy limits of $1,000,000 per occurrence and $2,000,000 in the aggregate, (b) commercial general liability insurance (including coverage for products

liability) and umbrella coverage, in each case, with policy limits of $1,000,000 per occurrence and $2,000,000 in the aggregate, (c) errors and omissions insurance of at least $1,000,000 and (d) cyber security liability in an amount of at least $5,000,000. CRO also agrees that it will maintain adequate insurance to cover its obligations hereunder (including, without limitation, indemnity obligations), as well as workers' compensation insurance in the amount required by the laws of the state in which CRO's employees are located. Sponsor will maintain appropriate liability insurance including coverage for products liability, either through comprehensive or commercial form general liability insurance or an equivalent program of self-insurance, at commercially reasonable levels, to cover its indemnity obligations under this Agreement.

12.2    **Certificate**.  Upon request by the Sponsor, CRO shall provide a certificate of insurance from its insurance carrier or a certification from the officer of the party responsible for CRO's self-insurance program, in each case evidencing compliance with all requirements of this Agreement.  The certificate will (a) indicate that the policy will not change or terminate without at least thirty (30) days prior written notice to Sponsor, (b) name Sponsor as an additional insured, and (c) indicate that the insurer waives its subrogation rights against Sponsor.

12.3    **Limitation on Liability**.  Neither Party, nor its Affiliates, nor any of its or their respective directors, officers, employees, consultants, subcontractors or agents shall have any liability (including without limitation, contract, negligence and tort liability) to each other for any loss of profits, opportunities or goodwill or any type of indirect or consequential damages in connection with this Agreement or any Project Addendum or the Services performed hereunder. Nothing in this Section 12.3 shall relieve a Party of its liability for damages to the extent arising from such Party's or its Affiliates', nor any of its or their respective directors', officers', employees', consultants', subcontractors' or agents' gross negligence, willful misconduct, breach of Section 5 or obligations under Section 11.

13.    **GENERAL.**

13.1    **Entirety**.  This Agreement, together with each Project Addendum(s) and any other exhibits referenced therein, is the entire and complete understanding between the Parties in regard to the covered subject matter hereof.  It replaces, supersedes and renders void any and all predecessor agreements between the Parties, whether written or oral with respect to such subject matter.

13.2    **Force Majeure**.  A Party shall not be liable for its delay in performance or failure to perform this Agreement if such delay or failure is due to any occurrence beyond the control of such Party including, without limitation, fire, earthquake, explosion, disease, war, invasion, government acts, weather, flood, civic unrest, embargoes, or strikes; *provided*, *however*, that the Party whose performance is affected uses and continues to use commercially reasonable efforts to overcome or remedy such event. Performance is excused for the period of such delay. The delayed Party

shall promptly notify the other Party in writing of the delaying event and the resolution or termination thereof. Notwithstanding the above, if the Force Majeure continues unabated for more than sixty (60) days, the Party not delayed may terminate this Agreement.

13.3    **Relationship of the Parties**.   The Parties hereto are independent contractors.  CRO shall not be considered to be an employee or agent of Sponsor nor shall this Agreement constitute, create, or in any way be interpreted as a joint venture, partnership, principal/agent relationship or formal business organization of any kind.  In that respect, neither Party shall have the authority to execute any agreement or incur or assume any obligations or commitments in the name of or on behalf of the other Party, nor shall either Party have any authority to negotiate any agreement, except as the other Party may expressly direct in writing.  CRO will be solely responsible for all taxes, tax returns, withholdings, payments and other similar statutory obligations required to be filed with or made to any federal, state or local tax authority with respect to CRO's performance of the Services and receipt of fees under this Agreement. CRO agrees to maintain full and sole responsibility for the payment of CRO employees' salaries and compensation, workers' compensation insurance, disability insurance and benefits, health insurance and benefits, sick time, vacation time, personal time off, time off for religious observance and any and all other responsibilities, obligations and liabilities employers have toward their employees. CRO agrees to defend, indemnify and hold Sponsor harmless from any and all claims made by any entity on account of an alleged failure by CRO to satisfy any such tax or withholding or similar statutory or contractual obligations.

13.4    **Notices**.   Any notice, demand, offer, request or other communication required or permitted to be given hereunder by either Party pursuant to the terms of this Agreement shall be in writing and may be delivered by certified or registered mail, return receipt requested, hand delivery, e-mail communication (with receipt acknowledgement), or by nationally recognized overnight courier  to the Parties at the addresses specified below (or at such other address for a Party as shall be specified by like notice, provided that notice of a change of address shall be effective only upon receipt thereof).  Any such notice shall be effective upon personal delivery, (1) business day after delivery if sent by overnight courier for next business day delivery, upon acknowledgment of receipt if delivered by electronic transmission, or three (3) days after being deposited in the postage prepaid certified U.S. mail, return receipt requested, in each case, addressed to the attention of the other Party at the address listed below.

|                            |                                       |
| -------------------------- | ------------------------------------- |
| If to CRO:                 | If to Sponsor:                        |
|                            |                                       |
| Trial Runners, LLC         | Aviceda Therapeutics, Inc.            |
| Attention:  Jill Healy     | Attention: Mohamed Genead,MD          |
| 116 West Villard           | Address:  One Broadway, 14th Floor    |
| Dickinson, ND  58601       | Cambridge, MA 02142                   |
| Tel: (701) 260-6120        | Tel: 617-225-4343                     |
| Email:  Jillhealy@trialrunners.com | Email: mgenead@avicedarx.com   |

**13.5**   **Severability**.  If any provisions of this Agreement or a Project Addendum shall be determined to be illegal, invalid or unenforceable in any respect, (i) such provision(s) shall be enforced only to the extent that it is otherwise enforceable or is not in violation of such law, (ii) the legality and enforceability of the remaining provisions of this Agreement or the Project Addendum shall not be affected thereby, and (iii) to the extent permitted and possible, the invalid or unenforceable provision(s) shall be deemed replaced by provision(s) that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable provision(s).

**13.6**   **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice of law principles that would require the application of the laws of a different jurisdiction.

**13.7**   **Waiver**.  The waiver by either Party of the failure by either Party to claim a breach of any provision of this Agreement or any Project Addendum shall not be deemed to constitute a waiver or estoppel with respect to any subsequent breach or with respect to any provision thereof. No waiver of any provision of this Agreement or any Project Addendum shall be effective unless it is in writing and signed by the Party against which it is sought to be enforced.

**13.8**   **Headings**.  Any heading used in this Agreement and Project Addendum is inserted for convenience and reference only and is to be ignored in the construction and interpretation of the provisions hereof. The terms "herein" or "hereunder" or like terms shall be deemed to refer to this Agreement as a whole and not to a particular section. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

**13.9**   **Assignment**.  Except as otherwise provided hereunder, CRO shall not assign, subcontract or otherwise transfer any of its rights or obligations hereunder or under any Project Addendum, or any part hereof or thereof, whether by operation of law or otherwise, without the prior written consent of Sponsor.  Sponsor shall have full rights to assign this Agreement, any Project Addendum or any rights or obligations hereunder or thereunder, or any part hereof or thereof.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties.

DocuSign Envelope ID: 74981E7C-B64E-43B6-9578-F86A1B438975    Case 1:23-cv-12468-IT    Document 1-3    Filed 10/23/23    Page 26 of 27

Page 25

Any purported assignment not consistent with this Agreement shall be null and void.

**13.10  Publicity**.  Neither Party shall use the other Party's name, trademark, trade name, logo or other designation or the names of the other Party's employees in any advertising or sales promotional material, press release, or other public disclosure without prior written permission of the other Party, except to the extent such disclosure is reasonably necessary for (a) regulatory filings, including filings with the United States Securities and Exchange Commission or the FDA, (b) prosecuting or defending litigation, and (c) complying with Applicable Laws.

**13.11  Counterparts; Amendments**.  This Agreement, Project Addendum or any amendments thereto, may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement or any Project Addendum by facsimile or in electronic format (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement and any Project Addendum.  No amendment or modification of this Agreement or any Project Addendum shall be valid or binding upon the Parties unless made in writing and executed by both Parties as described herein.  This Agreement, Project Addendum or any amendments thereto may only be executed in writing by a duly authorized officer of each Party and shall be legal and binding on the Parties.

**13.12  C.F.R. References**.  In performing its obligations under this Agreement, CRO shall comply with all Applicable Laws.  In the event that any specific parts or sections of the C.F.R. referenced in this Agreement are modified, amended, or renumbered, CRO shall comply with such modified or amended provisions, if applicable.  In the event that any specific parts or sections of the C.F.R. referenced in this Agreement are repealed, CRO shall not be obligated to comply with such provisions to the extent that they no longer apply to the Services but shall comply with the successor provision, if any.


**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been executed by the Parties hereto through their duly authorized officers as of the Effective Date.

**TRIAL RUNNERS, LLC.**

By: _____
      (Authorized Representative)

Name:  Jill Healy

Title:  CEO

**AVICEDA THERAPEUTICS, INC.**

By: _____
      (Authorized Representative)

Name:  Mohamed A. Genead, MD

Title:  April 12, 2022

David Callanan, MD

CMO