UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AVICEDA THERAPEUTICS, INC., * | |
| * | |
| Plaintiff, * | |
| * | |
| v. * | Civil Action No. 1:23-cv-12468-IT |
| * | |
| TRIAL RUNNERS, LLC, * | |
| * | |
| Defendant. * | |

MEMORANDUM & ORDER

September 30, 2024

TALWANI, D.J.

Defendant Trial Runners, LLC ("Trial Runners") moves to dismiss Counts 1 and 2 of Plaintiff Aviceda Therapeutics, Inc.'s ("Aviceda") Complaint [Doc. No. 1] for lack of standing under Fed. R. Civ. P. 12(b)(1). Trial Runners contends that at the time the Complaint was filed, Aviceda had suffered no injury for which it could recover damages, and therefore lacks standing to seek relief on Counts 1 and 2.[1]  For the reasons that follow, Trial Runner's Motion to Dismiss Counts 1 and 2 [Doc. No. 11] is DENIED.

I.  **Factual Background as Alleged in the Complaint**

A.  *The Parties*

Plaintiff Aviceda is a clinical-stage biotechnology company. Compl. ¶ 11 [Doc. No. 1]. Defendant Trial Runners is an ophthalmology contract research organization ("CRO"). Id. ¶ 13.

---

[1] Trial Runners does not seek dismissal of Count 3, which seeks declaratory relief. Mem. ISO Def.'s Mot. to Dismiss Counts 1 and 2 ("Def.'s Mem.") 1–2 [Doc. No. 12].

      B.     *The AVD-104 Study and the Master Clinical Services Agreement*

Aviceda contracted with Trial Runners to run Aviceda's clinical studies on its lead drug candidate for treating geographic atrophy ("GA"), AVD-104. Id. ¶¶ 19-21. On August 29, 2022, Aviceda and Trial Runners executed the Master Clinical Services Agreement ("Agreement"), defining Aviceda as the "Sponsor" and Trial Runners as the CRO for the AVD-104 study. Id. ¶ 21. The study was to be conducted in two parts. Id. ¶ 3.

As CRO of the AVD-104 study, Trial Runners was responsible for administering the study, producing clinical trial data, and communicating the data to Aviceda. Id. ¶ 36. Pursuant to the Agreement, Trial Runners was required to:

> perform the Services set forth in each Project Addendum . . . and warrants that it will perform the Services to the best of its ability in a professional, workmanlike, and timely manner consistent with industry standards and, as a contract research organization, in accordance with 21 C.F.R. § 312.52, in no case less than, Good Industry Practice, and in strict accordance with Applicable Laws, the terms and conditions of this Agreement, the applicable Protocol, and any Project Addendum.

Id., Ex. 1 (Agreement) § 3 [Doc. No. 1-3]. The Agreement required further that Trial Runners "maintain its records in a professional manner . . . to permit [Aviceda] to review the Study Information, Study Data and other records, documents, information, and Materials related to the Study in full . . . ." Id. § 9.4.

The Agreement further provided that Aviceda retained the right to terminate the Agreement "at any time and for any reason in whole or in part upon thirty (30) days' written notice to [Trial Runners]." Id. § 7.2. Upon termination, the Agreement provides for wind-down procedures to preserve the work done in the Study and to facilitate transition of the trial to a new CRO. Id. § 7.5. The Agreement provides further that upon termination, the parties mutually agree:

> (i) to cooperate to provide for an orderly wind-down of the Services provided by CRO hereunder, (ii) that CRO shall not undertake further work, shall use its best efforts to avoid incurring any additional costs, to mitigate all costs, damages, penalties, and expenses or shall not enter into further commitments with regard to any Services, except as mutually agreed upon in writing by the Parties, (iii) that CRO shall use all reasonable efforts to conclude or transfer any uncompleted Services, and (iv) that CRO shall deliver to Sponsor all Work Product developed as of the date of such termination or expiration, and all formats available, including electronic format and computer files and programs, that are the property of Sponsor as defined in this Agreement and such Project Addendum.

Id. The Agreement provides a thirty-day window for these wind-down procedures. Compl. ¶ 50 [Doc. No. 1]. During those thirty days, both parties remain bound by the obligations of the Agreement. Id.

Per Section 7.5 of the Agreement, upon termination, Trial Runners had an obligation that "[a]ny funds held by CRO which are unearned at the date of termination shall be returned to Sponsor within thirty (30) days after the termination date." Id., Ex. 1 (Agreement) § 7.5 [Doc. No. 1-3].

    C.    *Implementation and Notice of Termination of the Agreement*

As the study's Sponsor, Aviceda has had access to two databases throughout the study: a project management database called the Clinical Trial Management System, which includes the Trial Master File ("CTMS/eTMF") and is hosted by a vendor called Anju; and a trial database, which houses all clinical data and patient results from the study, hosted by a vendor called Medrio. Id. ¶ 31. Anju and Medrio were selected and retained by Trial Runners to host the data related to the study. Id. The parties agree that Aviceda alone owns all information stored in these databases. Id. ¶ 32.

The parties' dispute involves Part 2 of the Study, for which Aviceda alleges it has paid Trial Runners $945,351.40. Id. ¶¶ 29-30. As the Study progressed into Part 2, Aviceda elected to terminate the Agreement and replace Trial Runners as CRO. Id. ¶ 52. Aviceda provided Trial

Runners with written notice of termination on October 12, 2023, pursuant to § 7.2 of the Agreement. Id. ¶ 56. In its termination notice, Aviceda requested either the return of the money or an accounting of how the money had been spent by Trial Runners. Id., Ex. 5 (Email Termination Notice Sent to Trial Runners) [Doc. No. 1-7].

Through its counsel, Trial Runners acknowledged the termination notice, stating that "the termination date of the [Agreement] is November 11, 2023." Id. ¶ 57. Trial Runners has provided neither the funds nor the requested accounting. Id. ¶ 95.

    D.    *Trial Runners' Alleged Conduct During the Thirty-Day Wind-Down Period*

        1.    Blocking Access to Trial Data

On October 12, 2023, the day Aviceda sent the notice of termination, Trial Runners CEO Jill Healy responded to the notice by saying: "our attorney will be in touch to assure a smooth transition for Trial Runners, which will begin with compensation." Compl., Ex. 8 (Healy's Response to Notice of Termination) [Doc. No. 1-10]. The same day, Trial Runners removed the Aviceda team's access to the Medrio database. Compl. ¶ 64 [Doc. No. 1]. No reason was given for the removal of access, and it was only restored two days later, after Aviceda threatened legal action. Compl., Ex. 9 (Email from David Callanan about Database Access) [Doc. No. 1-11]. Aviceda charges that "it appears that Trial Runners was attempting to hold Aviceda's own data ransom in exchange for a payoff." Compl. ¶ 67 [Doc. No. 1].

        2.    Blocking Efforts to Wind Down

The next day, an attorney for Trial Runners reached out to Aviceda, requesting an additional $1,395,564.03 before cooperation with the wind-down could begin, without an explanation for the requested amount. Compl., Ex. 6 (Email Response to Notice of Termination) [Doc. No. 1-8]. Trial Runners' correspondence with Aviceda became combative quickly; on

4

October 17, in response to an email from Aviceda's Chief Medical Officer David Callanan about Trial Runners' wind-down obligations, Healy responded that to initiate the wind-down, Trial Runners would provide Aviceda with an expense report. Compl., Ex. 12 (Email Exchange Between Healy and Callanan) [Doc. No. 1-14]. When Ronda Ramsey, Senior Project Manager of the Study at Trial Runners, tried to communicate wind-down instructions to each party's clinical teams, Healy told her to halt all discussions between the Trial Runners clinical teams and Aviceda. Compl., Ex. 13 (Email Exchange Between Ramsey and Healy) [Doc. No. 1-15].

        3.       Continuing Site Visits Without Permission

Aviceda also alleges that Healy continued with at least one site initiation visit after the notice of termination was sent despite Callanan's October 9 request to place all such work on hold. Id. ¶ 85 [Doc. No. 1].

Further, Aviceda alleges that Healy, after learning that Aviceda was contracting with a new CRO, told Callanan to have the new CRO "stand down" from performing any transitional role. Id. ¶ 86. Aviceda alleges this behavior also contravened Trial Runners' Section 7.5 responsibilities, which include helping facilitate the study's transition to a new CRO in the event that Trial Runners was terminated. Id. ¶ 87. Aviceda alleges that Trial Runners' actions were all attempts to create new post-termination charges it could collect from Aviceda. Id. ¶ 85.

**II.    Procedural Background**

On October 23, 2023, Aviceda filed this lawsuit alleging that Trial Runners breached its Agreement obligations by, among other things:

> failing to provide Aviceda access to review its own data; not permitting Aviceda to retain all rights, title, and interest in and to all intellectual property rights, study inventions, work product, or specimens; refusing to commence an orderly wind-down process until November 11, 2023; refusing to allow its own clinical trial team to communicate directly with Aviceda; demanding immediate payment despite explicit invoicing instructions in the Agreement; failing to provide

>     substantiation for the demanded payment; demanding that Aviceda only
>     communicate to Trial Runners via its outside counsel, who is not part of the
>     clinical trial operations team; creating its own "version" of wind-down procedures
>     in spite of the existence of express clauses in the Agreement covering such
>     procedures; and stating an intention to "move forward with the study objectives
>     until the termination," over repeated and express instructions to the contrary from
>     Aviceda, per the Agreement's wind-down procedures.

Id. ¶ 90. In addition to this breach of contract claim (Count I), the Complaint asserts a breach of the implied covenant of good faith and fair dealing (Count II), and claim for a declaratory judgment (Count III).

In response, Trial Runners filed the pending Motion to Dismiss Counts 1 and 2 [Doc. No. 11] for lack of subject matter jurisdiction.

### III. Standard of Review

A motion to dismiss for lack of constitutional standing is properly brought as a challenge to the court's subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). See Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998). The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. Id. A court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id.

### IV. Discussion

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting Lujan, 504 U.S. at 560–61). "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz, 672 F.3d at 71 (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)). And where the question of standing is based on the pleadings, "the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016).

To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner, 823 F.3d at 731–32.

    A. *Count I: Breach of Contract*

For a breach of contract claim under Massachusetts law, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2014) (citing Singarella v. City of Boston, 342 Mass. 385, 387 (1961)). A pleading that makes this showing is sufficient to show an injury to the plaintiff's rights for purposes of standing. Katz, 672 F.3d at 72. The breach of a contract serves as "an invasion of a legally protected interest" that is "concrete" and "actual." Lujan, 504 U.S. at 560.

Trial Runners does not dispute that the contract between the parties was valid, nor does it argue that Aviceda's Complaint [Doc. No. 1] fails to allege a breach. The only issue raised by Trial Runner's Motion to Dismiss [Doc. No. 11] is whether, at the time the complaint was filed, Aviceda had suffered an injury from the alleged breach for which it could recover damages. Def.'s Mem. 2 [Doc. No. 12].

Aviceda's Complaint alleges economic and reputational harm suffered from Trial Runners' alleged breach of contract. Compl. ¶ 10 [Doc. No. 1]. Trial Runners responds that none of Aviceda's claimed harms are properly considered contract damages. Def.'s Reply ISO Mot. to Dismiss ("Def.'s Reply") 1 [Doc. No. 17]. As discussed below, Trial Runners is correct that some of these alleged harms—namely attorneys' fees and reputational injury—are not compensable under either a breach of contract or implied covenant of good faith and fair dealing theory of recovery. However, the other alleged harms are compensable.

1. Attorneys' Fees

Aviceda contends it expended additional financial resources when Trial Runners required all communications to go through counsel, forcing Aviceda to spend more money on attorneys' fees than it would have otherwise, an unnecessary out-of-pocket loss. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss Counts 1 and 2 ("Pl.'s Opp.") 6 [Doc. No. 14] (citing Wiener v. MIB Grp., Inc., 86 F.4th 76, 87 (1st Cir. 2023) (holding plaintiff suffered injury-in-fact after defendant's late disclosure filing forced plaintiff to incur additional attorneys' fees and costs)).

Attorneys' fees are generally not recoverable as an element of compensatory damages in breach of contract claims in Massachusetts. Rooney v. Samuelson, 1985 Mass. App. Div. 146, 148 (1985). There are exceptions to this rule, including: "(1) where a statute or court rule permits an award of such costs; (2) a valid contract or stipulation provides for attorneys' fees or (3)

exceptional circumstances invoke equitable or public policy considerations which warrant such recovery." Id. (citing Fuss v. Fuss, 372 Mass. 64, 70 (1977)). Here, no statute or court rule permits attorneys' fees, and the contract between Aviceda and Trial Runners does not provide that attorneys' fees be paid for an allegation of breach of contract.[2] Compl., Ex. 1 (Agreement) § 5.6 [Doc. No. 1-3]. There are also no exceptional circumstances invoking equitable or public policy considerations in this case. Rooney, 1985 Mass. App. Div. at 149 (citing Commissioner of Ins. v. Massachusetts Acc. Co., 318 Mass. 238, 242–44 (1948) (distinguishing three categories of exceptional circumstances as involving the administration of estates, trusts, or funds)). Accordingly, Aviceda cannot base standing on its claim for attorneys' fees on its breach of contract claim.

      2.      Reputational Harm

Aviceda asserts that it suffered reputational harm because it has been forced to explain the confusing study transition to the doctors operating the sites, which makes Aviceda look unreliable. See Callanan Decl. ¶ 10 [Doc. No. 14-1]. Aviceda is concerned that it will lose vendor relationships due to Trial Runner's failure to pay outstanding vendor invoices. Id. ¶ 11.

Damages for general reputational harm also are not recoverable in a breach of contract claim unless the plaintiff has alleged a resulting loss of a specific customer relationship or opportunity. See Redgrave v. Boston Symphony Orchestra, Inc., 855 F.2d 888, 892–93 (1st Cir. 1988); Jorgensen v. Massachusetts Port Authority, 905 F.2d 515, 518–19 (1st Cir. 1990) (noting

---

[2] Aviceda cites two cases as support for its argument that standing may rest on a claim for attorneys' fees. Neither case addresses attorneys' fees in connection with a contract claim. Wiener, 86 F.4th at 84-86 (Fair Credit Reporting Act claim); Shirokov v. Dunlap, Grubb & Weaver, PLLC, 2012 U.S. Dist. LEXIS 42787, at *49-51 (D. Mass. Mar. 1, 2012) (defending against copyright claim).

that Massachusetts law only awards damages for reputational harm on a breach of contract claim where the plaintiff has shown a resulting "loss of identifiable professional opportunities"). Though Aviceda has alleged "harm to [its] reputation in the medical community," Compl. ¶ 10 [Doc. No. 1], it has not alleged the loss of a specific customer or partner and so cannot base standing on alleged damages for reputational harm.

        3.        Economic Harms: Damages from Mismanagement and Overpayments

Aviceda also alleges economic harm resulting from Trial Runners' failure to provide accounting for the money it was pre-paid for Part 2 of the study and for money allegedly spent in contravention of a directive from Aviceda to halt all site initiations. Id. ¶ 85. While Aviceda alleges that it has not yet been able to ascertain the full scope of the monetary loss related to those site visits, see id. ¶ 30, these allegations are sufficient for standing.

Trial Runners argues that, though Aviceda did allege Trial Runners demanded a large payment in return for cooperation with the wind-down, Aviceda did not explicitly allege in its Complaint that it overpaid Trial Runners. Def.'s Reply 2 [Doc. No. 17]. This is semantics; the Complaint alleges that Trial Runners demanded a "ransom payment," that Trial Runners was attempting to "receive a greater payment than it was owed" after termination was noticed, and that Trial Runners still has not provided Aviceda with an expense report. Compl. ¶¶ 30, 95, 99 [Doc. No. 1]. Part of the compensatory damages Aviceda seeks is recovery of money Aviceda feels Trial Runners has been paid but has not earned, which is an overpayment.[3] See In re

---

[3] Trial Runners contends that Aviceda has "pleaded a risk of future harm but not past harm." Def.'s Mem. 6 [Doc. No. 12]. This argument is without merit: Aviceda has pleaded specific economic harm that occurred in the past as a result of Trial Runners' actions. The Complaint alleges that Trial Runners has retained money that it has not earned and has not accounted for. Compl. ¶ 30. See American Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (noting that

Evenflo Company, Inc., 54 F.4th 28, 32 (1st Cir. 2022) (noting that the complaint's allegations that the plaintiff would have paid less for a product if not for the defendant's misrepresentations would be "refer[red] to . . . as 'overpayment'").

      Trial Runners' remaining arguments that Aviceda has not pled sufficient injury lack merit. Trial Runners claims that Aviceda should be barred from receiving damages for Trial Runners' alleged mismanagement of Part 2 of the Study because Aviceda did not terminate the contract or sue on that basis, and the alleged harm took place after Aviceda sent its notice of termination. Def.'s Reply 2 [Doc. No. 17]. This argument misunderstands Aviceda's breach of contract claim. Aviceda does not seek to recover damages from Trial Runners for mismanagement of the Study, but for the alleged breaches of contract that occurred after the notice of termination was sent. Compl. ¶¶ 90, 94 [Doc. No. 1]. The Complaint includes these allegations of breach and, as discussed above, Aviceda has alleged sufficient injury resulting from these breaches. Per Trial Runners' own concession, the Agreement was still in effect until November 11, 2023, and any breaches of contract until that date are actionable.

      In sum, while Aviceda may not recover damages for the alleged reputational harm or attorneys' fees, Trial Runners' arguments in opposition to Aviceda's other alleged harms are unavailing. Aviceda has alleged concrete injuries with concrete remedies; it asks for compensatory, incidental, and consequential damages against Trial Runners for breach of contract. Compl. ¶ 24 [Doc. No. 1]. Accordingly, the court rejects Trial Runners' argument that Aviceda lacks standing to bring its breach of contract claim.

---

while past injury suffered is "an insufficient predicate for equitable relief," it would at least give plaintiffs "standing to bring actions for damages").

B.  *Aviceda Has Standing for Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing*

Trial Runners also asserts that Aviceda has not sufficiently alleged an injury resulting from a breach of the implied covenant of good faith and fair dealing. Def.'s Mem. 2 [Doc. No. 12]. Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. Hopkinton Friendly Serv., Inc. v. Global Companies LLC, 490 F. Supp. 3d 421, 427 (D. Mass. 2020). Where a valid contract exists, a violation of the covenant may still be actionable even if the contract itself has not been breached. Arborjet, Inc. v. Rainbow Treecare Scientific Advancements, Inc., 187 F. Supp. 3d. 217, 223 (D. Mass. 2016). The implied covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976)).

To show a breach of the implied covenant of good faith, a plaintiff need not prove the defendant explicitly acted in bad faith, but rather with a lack of good faith inferred from the circumstances. See Nile v. Nile, 432 Mass. 390, 398, 734 N.E.2d 1153 (2000). If a party's conduct is found to be motivated by a desire to injure the other party's rights to the benefits of the contract, such conduct may indicate a lack of good faith. See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013).

Aviceda has traced at least some of its harms to Trial Runners' alleged interference with the terms of the Agreement requiring cooperation to ensure an orderly wind-down in the event of termination. It has alleged that Trial Runners either failed to cooperate with or intentionally obstructed its wind-down responsibilities as required by the Agreement for the purpose of generating additional payments from Aviceda. It further alleges that Trial Runner's delay in

12

cooperation has caused several problems for Aviceda: (1) Aviceda lost access to its Medrio database, harming its ability to assess the Study and transfer it to a new CRO; (2) Aviceda has been required to retain legal counsel just to communicate with Trial Runners, adding costs; and (3) Aviceda has received demands for payment that Trial Runners has not substantiated with receipts or accounting, hindering Aviceda's ability to properly fund the continuation of the Study with a new CRO. Compl. ¶¶ 93–98 [Doc. No. 1]. Accordingly, the court finds Aviceda has sufficiently alleged injury resulting from the breach of the implied covenant of good faith and fair dealing, and has standing to bring that claim for damages as well.

### V.     Conclusion

For the foregoing reasons, <u>Defendant's Motion to Dismiss for Lack of Jurisdiction (Counts 1 and 2)</u> [Doc. No. 11] is DENIED.

IT IS SO ORDERED

September  30, 2024                                           /s/ Indira Talwani
                                                              United States District Judge